| | |
|---|---|
| **HORIZON NAVIGATION LTD.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-4497** |
| **PROGRESSIVE BARGE LINE, INC. ET AL** | **SECTION "L" (3)** |

## ORDER & REASONS

Before the Court is a motion to dismiss filed by Third-Party Defendant Ausca Shipping Limited ("Ausca"). R. Doc. 34. Defendant and Third-Party Plaintiff Progressive Barge Line Inc. ("Progressive") opposes the motion. R. Doc. 43. Ausca has filed a reply, R. Doc. 50, to which Progressive has filed a surreply, R. Doc. 54. The Court heard oral argument on the motion on December 19, 2018. R. Doc. 51. Having considered the parties' arguments and reviewed the applicable law, the Court is ready to rule.

### I.  BACKGROUND

This case arises out of an oil spill in the Mississippi River that occurred during the refueling of the M/V VITAHORIZON, for which the vessel's owner, Plaintiff Horizon Navigation Ltd. ("Horizon"), seeks to recover "fines, penalties, response costs and/or damages exceeding $1.1 million" from Defendant Progressive. R. Doc. 1 at ¶ 14. According to Horizon's complaint, Progressive overfilled the M/V VITAHORIZON's fuel tanks after allegedly failing to inform those aboard the vessel that the amount of the original fuel order had been increased from 1600 metric tons to 1650 metric tons. *Id.* at ¶¶ 6–12.

Prior to the spill, Ausca entered into a time charter with Horizon for the M/V VITAHORIZON. R. Doc. 28 at ¶ 11.[1] According to Progressive's third-party complaint, the time charter "obligates Charterer, Ausca, to provide and pay for all fuel (also known as bunkers) for the M/V VITAHORIZON." *Id.* at ¶ 12. Pursuant to this obligation, Progressive alleges, "Ausca contracted with [non-party Glander International Bunkering (Norway) AS ("Glander")] . . . to arrange for purchase of, and delivery to, M/V VITAHORIZON a quantity of bunkers." *Id.* at ¶ 15. In turn, Glander, allegedly acting as Ausca's agent, contracted with non-party Chevron Marine Products LLC ("Chevron") to purchase fuel for the VITAHORIZON. *Id.* at ¶ 17. On August 30, 2017, Chevron contracted with Progressive to deliver fuel to the M/V VITAHORIZON. R. Doc. 1 at ¶ 6. The next day, Chevron instructed Progressive to increase the amount of fuel to be delivered to the VITAHORIZON from 1,600 metric tons to 1,650 metric tons. *Id.* at ¶ 7.

Horizon alleges that, "[d]espite the increased order amount, on or about September 2, 2017, Progressive informed the VITAHORIZON that it would be delivering 1,600 metric tons of [heavy fuel oil ("HFO")] to the ship. Progressive never informed the VITAHORIZON that the amount of HFO ordered for delivery had been increased to 1,650 metric tons, or that it would pump more than 1,600 metric tons to the VITAHORIZON." *Id.* at ¶ 8. As a result, on September 3, 2017, "Progressive's crew overfilled the VITAHORIZON's bunker tanks causing HFO to spill onto the ship's deck, down her side, onto one or more of Progressive's vessels and into the Mississippi River." *Id.* at ¶ 12.

---

[1] The time charter is routine practice in the marine transport industry. *Sagaan Developments & Trading Ltd. v. Quail Cruises Ship Mgmt.*, No. 11–23873, 2013 WL 2250793, at *5 (S.D. Fla. May 22, 2013) (unpublished). "The general scheme of a time charter is that the owner turns over a fully equipped ship to the charterer and operates the ship for the charterer's benefit, being compensated by monthly hire." *Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994, 998 (1st Cir. 1983). Typically, "the owners pay the crew wages and supply their food, pay for engine room stores, keep the vessel repaired and pay for insurance[;] almost everything else falls upon the charterer." *Id.* (internal quotation marks omitted).

On May 1, 2018, Horizon filed suit against Progressive for "damages, expenses, costs and all other losses resulting from the incident," alleging the damage was caused by Progressive's negligence and its vessels' unseaworthiness. *Id.* at ¶ 15.[2] On August 30, 2018, Progressive filed a counterclaim against Horizon. R. Doc. 21. On September 21, 2018, Progressive filed a third-party complaint against Ausca and tendered to Ausca Horizon's complaint against Progressive, pursuant to Federal Rule of Civil Procedure 14(c). R. Doc. 28 at ¶ 1. Progressive alleges Ausca, as the charterer, had the legal duty and contractual obligation to purchase fuel for the vessel, provide orders and directions to the M/V VITAHORIZON's captain, and to advise Horizon of the number of bunkers to be delivered. *Id.* at ¶¶ 23–24. Progressive contends the damages sustained by both Progressive and Horizon were caused by Ausca's fault, negligence, want of due care, and breach of contractual obligations. *Id.* at ¶¶ 25–26.

## II.    PENDING MOTION

In its motion, Ausca seeks dismissal or a stay of Progressive's claims against it, including both Progressive's direct claims and Progressive's Rule 14(c) tender of Horizon's compliant. First, Ausca argues Progressive's direct claims sound in negligence; thus, Ausca contends, because Progressive's complaint does not allege Ausca owed any duties to Progressive, Progressive has failed to state a claim for negligence upon which relief may be granted. R. Doc. 34-1 at 2, 10. Second, with respect to Progressive's Rule 14(c) tendering of Horizon's complaint to Ausca and its claim seeking contribution, Ausca contends this claim turns on whether Ausca may be held directly liable to Horizon for its claimed losses. *Id.* at 2, 7–9. According to Ausca, its time charter with Horizon for the M/V VITAHORIZON contains an arbitration clause, calling for any disputes

---

[2] Horizon submits it has "maritime liens against the MN JUSTICE and the barge PBL 3001, her engines, boilers, tackle, apparel, furniture, etc., in rem, for the sum of about $ 1.1 million, plus interest from the date of the incident, costs and attorneys' fees, representing Horizon's losses due to the aforesaid incident." R. Doc. 1 at ¶ 16.

between Horizon and Ausca to be resolved through binding arbitration in London pursuant to English law. Thus, according to Ausca, because Progressive's tender and contribution claims would require Ausca to directly or derivatively defend itself against Horizon, any such claims must be submitted to arbitration. *Id.* at 8. As a result, Ausca contends the Rule 14 tender should be dismissed or stayed pending the outcome of arbitration between Ausca and Horizon. *Id.* Relevant to the instant motion, aside from Progressive's Rule 14(c) tender of Horizon's complaint to Ausca, at this juncture, Horizon has not brought any claims against Ausca, nor has Horizon entered into arbitration proceedings with Ausca.

In opposition, Progressive contends that, as there currently is not arbitration pending between those entities and it does not appear either party intends to engage in arbitration, granting a stay pending arbitration between Horizon and Ausca would serve only to prevent any recovery from Ausca in this case and "is nothing more than an attempted 'end run' around Progressive's Rule 14(c) rights." R. Doc. 43 at 3, 9–12. With respect to its direct claims against Ausca, Progressive points out that, "[u]nder general maritime law, . . . '[w]hether a defendant owes a plaintiff a legal duty is a question of law.'" R. Doc. 54 at 4 (quoting *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)). Thus, according to Progressive, because "an allegation that is simply couched as a legal conclusion (such as 'Ausca owed Progressive a duty under general maritime law') is not considered to be true for purposes of determining whether a claim for relief has been properly stated, . . . . it has pled sufficient facts to not only state a claim for relief against Ausca that is plausible on its face, but also to place Ausca on fair notice of the claims that it is directly liable to Horizon and to Progressive." *Id.* at 4–5.

## III.    LAW & ANALYSIS

In its motion, Ausca moves to stay or dismiss Progressive's direct claims for failure to state a claim. Ausca also seeks dismissal of Progressive's Rule 14(c) tender of Horizon's complaint or a stay of those claims pending arbitration between Ausca and Horizon. The Court considers each issue in turn.

### A.  Horizon's Direct Claims Against Ausca

Ausca argues that, to the extent Progressive brings direct claims against it, Progressive has failed to allege facts that, if true, demonstrate Ausca owed Progressive a duty of care related to the refueling of the M/V VITAHORIZON. Progressive disagrees, arguing it was not required to state in its complaint specifically that "Ausca owed Progressive a duty under general maritime law"; rather, Progressive contends its complaint states a claim for relief against Ausca, as the complaint "place[s] Ausca on fair notice of the claims that it is directly liable to Horizon and to Progressive." R. Doc. 54 at 4–5.

"[N]egligence is an actionable wrong under general maritime law," and the elements of that tort are "essentially the same as land-based negligence under the common law." *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 842 (5th Cir. 2005). Thus, to state a claim for negligence under maritime law, a "plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'" *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)). "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). "Determination of

the tortfeasor's duty is a question of law . . . ." *Id.* (quoting *Miss. Dep't of Transp. v. Signal Int'l LLC* (*In re Signal Int'l LLC*), 579 F.3d 478, 490 (5th Cir. 2009)).

The determination of the existence and scope of a duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). A duty "may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct." *Id.* "To be foreseeable, the harm alleged must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of the risk' created by that conduct." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 211 (quoting *Consol. Aluminum*, 833 F.2d at 67). Thus, if the injuries allegedly suffered by Progressive as a result of Ausca's negligent failure to inform Horizon or the VITAHORIZON of the increased fuel order were not foreseeable— namely, that the VITAHORIZON's bunker tanks would overfill, causing oil to spill onto one or more of Progressive's vessels and into the Mississippi River—then Ausca owed no duty to Progressive and is not liable to Progressive as a matter of law. *See id.* at 68; *Republic of France v. United States*, 290 F.2d 395, 401 (5th Cir. 1961) (a defendant must have "'knowledge of a danger, not merely possible, but probable'" (quoting *Dalehite v. United States*, 346 U.S. 15, 42 (1953))).

In the context of maritime torts, a harm can be considered a foreseeable consequence of an act or omission "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *Id.* The "determination of duty [must be made] by reference to the general sorts of harms that are reasonably foreseeable consequences of the scope of danger risked by the negligence involved." *In re Signal Int'l LLC*, 579 F.3d at 493.

The Fifth Circuit has on several occasions examined foreseeability of harm in the context of maritime torts. In *Consolidated Aluminum Corporation v. C.F. Bean Corporation*, for example, after the defendant's dredge negligently ruptured a natural gas pipeline, the plaintiff, a business that relies on the supply of natural gas, sued to recover for physical damage caused to its manufacturing facilities and attendant economic loss due to the disruption of its natural gas supply. 833 F.2d at 66. The Fifth Circuit refused to impose liability, noting it was "not persuaded [the defendant] could have anticipated that its failure to follow safe dredging practices would likely result in physical damage to the equipment and work-in-progress at [the plaintiff's] aluminum reduction plant several miles away." *Id.* at 68. The court explained:

> The harm was not of a general sort expected to follow from the failure to dredge carefully in proximity to a gas pipeline. Injury to property and persons from the escaping gas, or from a fire which might have ensued, would be examples of consequences that would be foreseeable. . . . But the damage arising from the loss of natural gas supply, in turn causing the shut down of electric turbines, in turn causing a loss of electric power vital to the aluminum reduction process, with the ultimate result being substantial damage to equipment and product-in-process, goes beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers.

*Id.* Thus, because the damages the plaintiff sustained were not reasonably foreseeable, the defendant owed the plaintiff no duty, and thus, the Fifth Circuit held the defendant was entitled to judgment as a matter of law. *Id.* at 67.

Contrastingly, in *In re Signal International LLC*, after negligently-moored barges broke free and allided with a bridge during Hurricane Katrina, the Fifth Circuit found "the risk of allision with a fixed structure located within the reach of the anticipated storm surge was foreseeable if the barges broke free due to negligent mooring," and that "those possessing fixed or other property within the path of the anticipated surge" were in "the general class of persons for which the harm of allision was foreseeable." 579 F.3d at 492. In *Signal*, the court distinguished its holding from

the holding reached in *Consolidated Aluminum*, noting that the harm in that case "did not arise from the risk of danger created by negligence and instead involved [an] improbable interplay of natural and human forces . . . and the party at fault was able to identify events that would not have been foreseen by a reasonable person." *Id.* at 495 n.19.

Similarly, in *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 592 (5th Cir. 2016), the plaintiff, the captain of a supply vessel supporting Chevron's platform operations off the Nigerian coast, alleged he was attacked and kidnapped by pirates after the defendant, Chevron, negligently broadcast the vessel's "route information and locations over easily-accessible VHF radios," despite knowing "about of the real risk of piracy in the region and of the specific threats received by the [vessel]." *Id.* at 588–89, 592. Vacating the district court's grant of summary judgment in favor of Chevron, the Fifth Circuit explained, "These allegations are sufficient to suggest that the harm suffered by Thomas was reasonably foreseeable to Chevron and that Chevron consequently owed him a duty not to subject him to the conditions he encountered on his October 22, 2013 voyage." *Id.* at 592–93.

In this case, assuming the allegations in Progressive's third-party complaint against Ausca are true, which the Court must at this stage in the litigation, Ausca was responsible for paying for and providing all fuel for the M/V VITAHORIZON. R. Doc. 28 at ¶¶ 11, 12. Attendant to that responsibility, Progressive claims Ausca was responsible for communicating the amount of fuel to be delivered to the vessel. *Id.* Ausca, through its agents, hired Progressive to refuel the vessel, but negligently ordered more fuel than the vessel could hold. *Id.* at ¶¶ 6, 15, 17. Despite knowing that the amount of fuel ordered exceeded the vessel's capacity, Ausca did not inform Horizon, the M/V VITAHORIZON, or those aboard the vessel of the increased fuel order. *Id.* at ¶¶ 19–22, 26(1)–(7). The logical outcome of attempting to refuel a vessel with more fuel than the vessel can carry is that

the fuel will overflow, damaging both the vessel being refueled as well as the bunker barge refueling it and the waters in which the vessel sits. As the Fifth Circuit concluded in *Signal*, the harm in this case arises "from the risk of danger created by negligence," unlike *Consolidated Aluminum*, which "involved [an] improbable interplay of natural and human forces." 579 F.3d at 495 n.19. Thus, the Court concludes Progressives' allegations are sufficient to suggest the harm suffered by Progressive was reasonably foreseeable to Ausca and that Ausca consequently owed Progressive a duty not to subject it to the damages it sustained as a result of the September 3, 2017 oil spill. Accordingly, the Court will deny Ausca's motion to dismiss Progressive's direct claims against it.

### B. Progressive's Rule 14(c) Tender of Horizon's Complaint to Ausca

Having concluded Progressive's third-party complaint states a direct maritime claim for negligence against Ausca, the Court now considers whether to stay Progressive's Rule 14(c) tender of Horizon's complaint to Ausca in light of the arbitration agreement contained in the time charter between Ausca and Horizon, notwithstanding the fact that Ausca and Horizon are not in arbitration and apparently do not intend to submit to such proceedings.

"One of the prominent aspects of admiralty procedure has been liberal third-party practice." 6 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1465 (3d ed.). This feature of admiralty law originally derived from "the inherent power of a court, having jurisdiction of a cause, to bring into the suit other parties whose presence would enable the court to do substantial justice in regard to the entire matter." EDWARD GRENVILLE BENEDICT, THE AMERICAN ADMIRALTY ITS JURISDICTION AND PRACTICE WITH PRACTICAL FORMS AND DIRECTIONS 277 (1910). This policy acknowledges that, although a defendant could file a separate suit against a potentially liable third-party, to allow two suits based on the same incident to proceed separately is judicially inefficient.

> [E]ven if the remedy against the other vessel, or her owners, for contribution, were still available, and the same witnesses were still procurable, the liability to

perversions of the truth in any subsequent suit after the decision of the court had once been made known upon the facts of the case, would be so great, considering the witnesses in such cases; the difficulties of the trial would be so greatly increased through the varying testimony; and contrary judgments as to the same collision would sometimes be so unavoidable, that the result of the practice of admitting successive independent suits concerning the same collision could hardly fail to discredit the administration of justice. … [Consequently,] even if an independent suit for contribution after payment would lie, still the court ought for the above reasons to encourage, if not absolutely require, any such relief to be sought so as to be heard and decided with the original cause.

*The Hudson*, 15 F. 162, 169–170 (S.D.N.Y. 1883).

In 1989, the U.S. Supreme Court adopted Admiralty Rule 59 to govern the procedure used for impleading third parties in admiralty actions. *See In re New York & P.R. Steamship Co.*, 155 U.S. 523, 528 (1895). "This rule provided for procedure through which, in a suit against one vessel for damage by collision, process might be issued in the same suit against any other vessel charged with contributing to the same collision, or any other party, and for proceedings thereon." *Id.* Admiralty Rule 59 was later re-designated as Admiralty Rule 56.

"An important feature of Admiralty Rule 56 was that it allowed impleader not only of a person who might be liable to the defendant . . . but also of any person who might be liable to the plaintiff. The importance of this provision was that the defendant was entitled to insist that the plaintiff proceed to judgment against the third-party defendant." *Montauk Oil Transportation Corporation v. Steamship Mutual Underwriting Association (Bermuda) Ltd.*, 859 F. Supp. 669, 675 (S.D.N.Y. 1994) (citing Fed. R. Civ. P. 14 & 1996 committee notes). Federal Rule of Civil Procedure 14 was modeled on Admiralty Rule 56. The Rule provides that, after a defendant tenders the complaint to a third-party, the action "shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff." Fed. R. Civ. P. 14. At base, the Rule was adopted to protect defendants' interests as well as to promote judicial economy.

The FAA also safeguards litigants' rights. Pursuant to the FAA, any party "aggrieved by the . . . failure or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed." 9 U.S.C. § 4. The Act provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ." 9 U.S.C. § 3.

In this case, Ausca's contract with Horizon provides in pertinent part:

> This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

R. Doc. 111-2 at 10.[3] There is no dispute as to whether this is a valid and enforceable arbitration clause. Thus, the issue before the Court is whether, pursuant to the FAA, the arbitration agreement between Horizon and Ausca requires the Court to stay Progressive's Rule 14(c) tender pending arbitration, despite the fact that there is no arbitration pending between Horizon and Ausca, and no such action is forthcoming.

---

[3] Chapter 2 of the FAA explains that the Act is applicable to foreign and international arbitration clauses, and Chapter 1 of the Act has residual applicability as well. *See* 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.") Thus, the provisions of 9 U.S.C. § 3 apply with equal force to foreign and international arbitrations, such as the arbitration agreement contained in Ausca and Horizon's time charter.

The U.S. Court of Appeals for the Fifth Circuit confronted a similar issue in *Texaco Exploration & Production Co. v. AmClyde Engineered Productss Co.*, 243 F.3d 906, 908 (5th Cir. 2001). There, the Fifth Circuit considered whether to carve out an exception to the FAA, where, in admiralty cases, its enforcement would deny a party the ability to implead a third-party defendant pursuant to Federal Rule of Civil Procedure 14(c). In *Texaco*, following an accident at Texaco's production facility, Texaco sued several entities allegedly at fault for the accident, including AmClyde. *Id.* Texaco, having a mandatory arbitration clause in its contract with McDermott, did not file a complaint against that entity. *Id.* "Texaco attempted to avail itself of this alternative dispute resolution provision [with McDermott], but was frustrated when AmClyde tendered McDermott as a third-party defendant under Federal Rule of Civil Procedure 14(c)." *Id.* Noting that the FAA's purpose "is to enforce private arbitration agreements 'even if the result is piecemeal litigation,'" the Fifth Circuit reversed the district court's decision not to enforce the arbitration agreement between Texaco and McDermott and remanded the case to the district court for the issuance of an order staying the litigation pending the outcome of the contractually mandated arbitration. *Id.* at 912. Ultimately, the Fifth Circuit concluded that the policy of liberal joinder in maritime cases embodied in Rule 14(c) does not supersede the statutory right to enforce contractual arbitration guaranteed by the FAA. *Id.* at 910.

Progressive argues *Texaco* is materially different from the case at bar, and thus contends it is not binding on the Court. Specifically, Progressive points out that in this case, unlike the parties in *Texaco*, there is no arbitration pending and it does not appear such proceedings will ever come about. Notably, in its analysis in *Texaco*, the Fifth Circuit stated, "A conflict arises *only if Rule 14(c) is held to thwart enforcement of the arbitration agreement* pursuant to the district court's order." *Id.* at 910. Given that apparently Horizon does not intend to arbitrate its potential claims

with Ausca, Progressive submits that denying the stay in favor of Progressive's Rule 14(c) tender thus would not thwart Horizon and Ausca's arbitration agreement; to the contrary, Progressive argues staying the claims pending an arbitration that will likely never come to pass thwarts Progressive's Rule 14(c) rights.

Despite the procedural differences in the case at bar and the litigants in *Texaco*, the Fifth Circuit's holding was clear: "the policy of liberal joinder in maritime cases embodied in Rule 14(c) does not supersede the statutory right to enforce contractual arbitration guaranteed by the [Federal Arbitration Act]." *Texaco Explor. & Prod. Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906, 908 (5th Cir. 2001). This holding is binding on this Court, notwithstanding the fact that no arbitration is currently pending. "Section 3 [of the FFA] empowers a district court only to stay an action, leaving to the claimant the choice of arbitrating the claims or abandoning them." *LaPrade v. Kidder Peabody & Co., Inc.*, 146 F.3d 899, 903 (D.C. Cir. 1998). Thus, as the Fifth Circuit has explained, "so long as a written agreement to arbitrate exists there is no specific requirement that arbitration actually be pending before a stay of litigation can be granted." *Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 753 (5th Cir. 1986). "In other words, once a stay is granted under Section 3, litigation of the dispute may end there if the claimant chooses not to pursue its claims in arbitration. Because a stay under Section 3 need not result in arbitration . . . , there is little reason to require that an arbitration be commenced by a defendant against itself before a stay can be ordered." *Sims v. Montell Chrysler, Inc.*, 317 F. Supp. 2d 838, 841 (N.D. Ill. 2004). In fact, the U.S. Supreme Court has affirmed a stay of litigation in which no affirmative demand for arbitration had been made, no motion to compel arbitration had been sought, and there were, at that point in the litigation, apparently no ongoing arbitration

proceedings. *See Shanferoke Coal & Supply Corp. v. Westchester Service Corp.*, 293 U.S. 449, 453–54 (1935).

Although such a holding will potentially result in piecemeal litigation, the FAA's purpose is to enforce private arbitration agreements "even if the result is 'piecemeal litigation,' at least absent a countervailing policy manifested in another federal statute." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985). As the Fifth Circuit noted in *Texaco*, Rule 14(c) may not be used to override the FAA's strong policy favoring arbitration. *See Texaco*, 243 F.3d at 910. Moreover, even if Horizon never brings claims against Ausca, Progressive's interests will be protected, as apportionment of liability exists whether or not Ausca is impleaded under Rule 14(c). *See id.* Finally, "[t]he fact that [a] defendant has successfully impleaded a third party does not guarantee that the third-party claim will be adjudicated in conjunction with the main claim." WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE 533 §1460 (2010). Thus, guided by the Fifth Circuit's holding in *Texaco*, the Court will stay Horizon's claims against Ausca pending the outcome of the arbitration, if any, between them.[4] *See Texaco*, 243 F.3d at 910 ("*If* arbitration goes forward between Texaco and McDermott, it need not hold up or interfere with the admiralty litigation between Texaco and the other defendants." (emphasis added)); *Midwest Mech. Contractors, Inc.*, 801 F.2d at 753 (explaining that courts must grant a stay in light of a valid arbitration agreement regardless of the arbitration's status).

---

[4] In the alternative, Progressive requests that, should the Court grant Ausca's motion to stay, the Court also enter an order compelling arbitration between Horizon and Ausca. R. Doc. 43 at 3. The Court finds it has no authority to do so. Progressive further suggests the Court "enter an order declaring that the arbitration proceeding between Horizon and Ausca will have no bearing on this Court's determination of Progressive's liability" in the event the Court orders Horizon and Ausca to arbitrate. *Id.* The Court finds such a request premature and will deny it without prejudice.

## IV. CONCLUSION

Accordingly;

**IT IS ORDERED** that Third-Party Defendant Ausca Shipping Limited's motion to dismiss Progressive Barge Line Inc.'s Complaint against it is **GRANTED IN PART AND DENIED IN PART**. R. Doc. 34. To the extent Ausca seeks dismissal of Progressive's direct claims against it, the motion is **DENIED**. To the extent Ausca seeks to dismiss the complaint tendered by Progressive pursuant to Rule 14(c), the motion is **DENIED**; however, the claims against Ausca brought against it by Horizon via Progressive's Rule 14(c) tender are hereby **STAYED** pending the outcome of contractually mandated arbitration. In other words, Horizon's claims against Progressive and Progressive's claims against Ausca and Horizon remain, while Horizon's claims against Ausca pursuant to Progressive's Rule 14(c) tender are stayed pending the outcome of arbitration, if any.

New Orleans, Louisiana on this 5th day of February, 2019.

Eldon E. Fallon
U.S. District Court Judge